May it please the court, Cal Potter on behalf of Manuel Silva, I'd like to reserve five minutes of my time. Knowing that the court is familiar with the facts of this case, I'd like to focus on why the trial court erred in the application of the third prong of the Saussure v. Katz test in finding that, in fact, after finding that there was a constitutional violation and that there was well-settled law at that point in time, that the officers acted in a reasonable fashion. I would submit that the finding here as to what was reasonable, the judge made a distinction as to what actually occurred to reach the subjective attempt of the officers and totally disregarded the facts most favorable to the plaintiff, the appellant in this action, Mr. Silva, as to what... But what were the facts that were favorable to the appellant? The facts favorable to the appellant, his argument was that, indeed, there was confusion as to whether, in fact, there was a threat made from his apartment to begin with. But that person who made the phone call to the police actually, when the police arrived, led them right to room 110, didn't he? He, in effect, directed them right to that room, and that's where they went. And then they realized, after pulling the occupant out, that they had the wrong room. That was part of the testimony from one of the officers. The officer at the border said that there was confusion from the beginning. But what occurred in terms of the information about drying was that it was an African American. Mr. Silva is not an African American. He's Caucasian. They didn't know that until they opened the door, did they? Correct. But when they opened the door at that point in time, they found an elderly individual who was barefoot and in his sweats. But he could have been a hostage. I mean, the call said the person had a gun, didn't they? He could have been many things, but what we're dealing with here is what is reasonable. And what is reasonable is to ask an individual to engage in a conversation. Traditionally, this is known as a knock-and-talk type situation. And the facts most favorable to Mr. Silva at that point is that as he tries to say that he is not feeling real well, he is told to shut the F up, and at that point in time he is grabbed. And his testimony is that he is drug outside of the apartment at that point in time, which is completely different than the subjective intent found by the district court in the third prong after finding in the first prong that there was a constitutional violation. And I would submit to the court. Are you talking about the excessive force part now? Yes, sir. All right. And in terms of looking at it from a legal standpoint, if, in fact, there is a constitutional violation and that it was clearly established here, then there was not a basis to continue to hold him either. And the continuing injury that he sustained was when the officers then, after holding him for approximately 15 to 20 minutes, and once again the district court made a finding that there was a detention that arose to an arrest, that there was a constitutional violation, that, in fact, the actions were or the law was well settled but that there was, once again, a reasonable mistake that had been made by the officers. But in finding that and the problem with that type of analysis is that he looks, once again, not to what the facts most favorable to the plaintiff were in finding this and making that determination because what Mr. Silva testified to was that he was grabbed once again and picked up and thrown into his apartment on the love seat. Reading this, it seems clear to me that the judge did accept the facts in the light most favorable to Mr. Silva, which is why he concluded that he very well may have an excessive force claim. He sets forth all of those facts, talks about them, and it says in regular language, I'll give him that nevertheless. And it's the nevertheless part that you have most of your argument with, right? But it seems to me that the Court acknowledged the facts as Mr. Silva presented them to the Court. And he did, and that's how he found the constitutional violation. Exactly. So it's not that he ignored those facts at all. He said, I'll give him that, however. And then he goes on to the third problem, and that's your argument, really, is that the judgment exercised by the district court on the third part was mistaken. And we review that de novo. Correct. At 236 of the record, at the top of the page, he says, the defendant officers could have believed that hurrying Silva away from the scene, even if in doing so Silva was to some extent dragged, where they believed someone in Silva's apartment was armed, was within the bounds of the appropriate police responses. And my argument to the Court is that, in fact, Mr. Silva's testimony was that he was grabbed and drug out of the apartment. If a trier of fact were to believe the two officers literally dragged a 71-year-old man out of his apartment and then detained him by pushing him chest first against the door for 15, 20 minutes, I mean, he gives them all of these facts. Right. But what he says is the reasonableness is based upon a fluidity type exception to these types of cases, saying that these officers' actions could have been reasonable based upon the fact that this case law is very fluid and there could have been changes. And I would submit that that isn't correct here. And looking at the case, the Ninth Circuit cases since, Sassier v. Katz, the Robinson v. Solano type case that looked back to Chu v. Darrell Gates and those type of situations, we know that the Court has had many situations to look at a situation where somebody is called out. And in Robinson v. Solano, you had a situation where this individual had killed a dog and was supposed to be armed with a shotgun and, in fact, had made an effort to hunt down another dog. And in that particular instance, this Court found that the officer that then subdued Mr. Robinson had a good faith belief that he may have been armed at that point in time. The distinctions as to the factual basis here, and, once again, the Court did wrestle with these issues and tried to make a determination, I believe, that was following Sassier v. Katz. But, once again, it looks to this third prong after making the constitutional determination that there was a violation and that there was well-settled law that these actions were appropriate. But my argument to this Court is that the line was drawn and was drawn by Robinson v. Solano and that we're undecided after this case. I understand. But what they were looking at were the types of actions. And in that particular case, they looked to whether, in fact, you have a right to point guns at individuals, whether you have a right to hold an individual in a detention-type situation. But in Robinson, which was decided after this, the Court decided that it hadn't been established you couldn't point a gun at somebody. And so that's why they allowed the immunity in that case. But they said, in the future, now you're on notice. And Robinson said, we never established you can't point a gun at people under these circumstances. And that was out in the open. That's correct. And the distinction there is Robinson was involved in the acts. He is the individual that they made the call on. But he was out in the open when they confronted him. He had obviously no weapons when they pointed the gun at him. That's a materially different fact situation than here, where somebody says there's a guy in the apartment with a gun and the police go. Right. But the guy that is in the apartment is an African-American. What would the Constitution require of these police officers, assuming that it was reasonable for them to believe this is the apartment where somebody had a gun? What did the Constitution require when they opened the door and there was Silva? It required them to question at that point in time. Once he is removed, they're telling us that we've got to tell all officers, person in the house with a gun, doors open, you've got to question the person before you take steps to make sure that it's secure. Well, it happens all the time. It's called a knock and talk. And what occurred here was that you had an individual asleep in his apartment, 71 years old, never been in trouble in his life, never had any contact with the police, is suddenly grabbed and pulled out of his apartment after he attempted to try and talk to him. And at that point in time when there is nobody in that apartment, he's removed. I mean, they didn't question him about whether, in fact, he had had any problems in that evening or whether there was any concern on his part. But what occurred was he is then held and detained. Now, his testimony is he's thrown against the wall at that point in time. And now they're trying to say, well, he was a victim and we were trying to protect him. Let me ask you about that. He offers some conflicting testimony. How are we supposed to construe that or how is the district court? Because he says, well, they really weren't holding the guns when they touched him. And then he says in his affidavit, well, they threw me against a concrete wall and ordered me at gunpoint to stay against the wall. Doesn't he kind of create his own factual issue about this gun business? Well, there are two different situations there with the guns. All right. The first officers are Worters and Walters that are involved with that conduct. He is then removed and held out there for, he says, 15 to 20 minutes out on that area. The judge made a determination that he wasn't completely confined because when his false teeth fell out of his mouth, he was able to bend over and pick those up. And so somehow he was not being completely restrained at that point in time. And I think from the testimony at the deposition is he wasn't held at gunpoint all the time, but he wasn't allowed to leave during that 15 to 20-minute juncture. He was crying and he was refused. Let's get this straight then. Even in his own testimony, he's not held at gunpoint all the time, but he's not free to leave, basically. That's correct. So then the question becomes whether it was reasonable for the officers to know that holding this gentleman, sometimes at gunpoint but not certainly the whole time, was in violation of the Constitution. And I guess I'm having some trouble with that because even under Robinson where they had him with a gun, it wasn't clear at the time the officers were holding Robinson that it was a constitutional violation. I'm not sure how these officers would divine that this circumstance was a constitutional violation. It's in terms of the length of the detention and then the future actions after that. Okay. So let's try to ‑‑ okay. So it's the length of the detention, which is 15 minutes? 15 to 20 minutes is what the testimony was. And the actions after that, meaning what? They physically grabbed him, picked him up, took him back into the apartment, and his testimony was he was thrown on the love seat. And here's an individual who all of the ‑‑ I think the consistent testimony is that he was crying, that he was distraught, that he was pleading that he hadn't done anything wrong, and it was a situation where he didn't agree to have them pick him up and bring him back into the apartment and, in his testimony, throw him back on the love seat. So let me understand that, though, from the officer, from an officer's point of view, you're supposed to leave him out there? I mean, you know what I'm saying? What I'm saying is there's a sort of ‑‑ I actually thought that was some effort to kind of quell this, you know, to kind of ratchet down the situation by taking him back in there and putting him down. It didn't work out as well as they might have hoped, of course. But believe me, if they'd left him outside, then you'd be telling us that would be ‑‑ It's not rocket science. All you have to do is call the paramedics. If the individual is truly distraught, you call the paramedics, which is done. But then those individuals will deal with people in a humane fashion. In other words, you keep him outside in his bare feet until the paramedics come? I mean, they carried him back in. He was pretty shaken up. They carried him back in. He wasn't saying, don't take me in. Your Honor, his testimony ‑‑ And they stayed with him afterwards, didn't they, because of his condition? They stayed with him until ‑‑ Didn't they want to have him have medical help and he didn't want it or something? That's correct. He was distraught at that point in time. But the actions are not reasonable. The actions are not reasonable by police standards, nor are they reasonable under the facts of this particular matter. He was held outside for the 15 to 20 minutes in January in Las Vegas, and even though it's a desert community, it's cold in that time of the year. He is held outside during that point in time without shoes, blankets, or any effort to do anything. I thought you said they should have kept him out there until the paramedics came. Well, no, they should have called for the paramedics. He was distraught and crying from the very beginning. And there could have been efforts made. I mean, they have blankets. They could do this. If he's truly the victim, then why aren't they treating him like a victim at that point in time? If that's your question, then you need to fit that into the constitutional rubric. Because a lot of things in hindsight might have been smarter for them to do. But the question is whether what they did do, whether they should have known that was in violation of the Constitution. Here's what you have from the very inception. The Court relies upon the Mincy case, Mincy v. Arizona, to the proposition that you can go in and do a complete sweep. And our argument initially was that, in fact, you can't do that, that once you have the probable cause or the reasonable suspicion that there is something that occurred, which I think the telephone call provides to the officers at that point in time, that you have a right then to question the individual as to what is occurring and what is happening. And that's not what occurred here. There was no ---- How do they know there's nothing wrong if they don't do a sweep? Supposing he doesn't tell the truth. Supposing he was in on something. The officers have got an emergency call to go to a place. The person with the gun could be somebody else hiding in a closet saying, get rid of those people or I'll get you later on or something. I mean, you don't know. What's an officer supposed to do? Because you base probable cause upon the articulable suspicion that is available to them, the facts that are available to them at that point in time. And one of the facts is that they don't know what's in that apartment other than the man who was standing at the door. They're supposedly looking for him. And they've had a complaint, and the person who was calling led them right to that spot, who may or may not have been the man who was standing there on his bare feet. No. The individual they get the call on is an African-American. This gentleman is not. How do they know that? Well, they're told that by dispatch that it's an African-American. That's the testimony that some. All the more reason they might think there's an African-American. This person isn't an African-American. Maybe there's an African-American in the apartment somewhere. But that isn't what the law tells us. And if you're able to put in what could, should, or may have happened, then that whole area of the Fourth Amendment and that progeny of the law is changed. Well, you want the officers to be prescient and to have that written into the Constitution, that they can't be wrong. Well, it's not that they can't be wrong, but here's the misapprehension on their part. They believe that they have the right, even after him stating that there was nothing wrong, it didn't feel good, and no explanation from the individual that's living in his house, to be removed from his home, physically removed from his home, so that they can then do some type of complete sweep of the premises. And I don't believe the Constitution allows for that. I don't believe that the facts of this case are anywhere close to what the Mincie-type case is dealing with. But I also want to focus on the tort action here, because the judge also ruled that the state tort claims under Nevada law, there was an immunity situation, and it went off on whether this was a discretionary act or whether it was ministerial. And there is mention in the briefs about this Jim Carey v. Nevada Gaming Control being the controlling authority out of this circuit and interpreting the state law. I would submit to the court that Jim Carey is legally distinguishable from this particular case, because, and we cite the Lisenby case out of the state of Nevada, but where you have a situation where there is a constitutional violation, which the court found here on two different instances, the constitutional violations. The Lisenby says officers cannot violate the Constitution. And if it, in fact, is a constitutional violation, then there is liability. The Carey case talks about this discretionary versus ministerial. But in that particular instance, that was a failure to identify with Nevada Gaming Control. And those statutes, which were obstructing a police officer and I believe resisting, were held unconstitutional by the Ninth Circuit. So in that instance, the officer was making an arrest based upon unconstitutional statutes. And so in that instance, they said, well, it wasn't a situation where he was making a decision that was wrong, because he could have believed that these statutes were correct. Here, there is no statutory construction involved as to Mr. Silva's detention. And I would submit that based upon the fact that there is a constitutional violation on two occasions found by the court, that indeed the state court claims for battery and intentional emotional distress should not have been dismissed. Thank you, Counsel. You have two minutes left for rebuttal. May it please the Court. My name is Thomas Tillerton, here on behalf of the Las Vegas Metropolitan Police Department and all the individual officers named in the case, here on appeal to review the propriety of Judge Hicks' order granting a motion for summary judgment in its entirety. In part, the doctrine of qualified immunity. Let me first approach, Your Honor, the supplemental jurisdiction claims. That's where Mr. Potter left off and might be easier to touch upon that briefly. The Court decided summary judgment on the state law claims based on the doctrine of discretionary immunity. That's Nevada Revised Statute 41.032, based on a number of cases out of the Nevada Supreme Court involving alleged police misconduct to that statute. Maturi is one of the cases which the court granted summary judgment to an officer who decided to handcuff someone in back who suffered from cerebral palsy because it was discretionary whether to handcuff him in front or in back. Foster was a case involving alleged inappropriate criminal investigation of an abuse and neglect case. The Nevada Supreme Court said criminal investigations are inherently discretionary, regardless of the fact that there's departmental guidelines on how to carry them out. And we have the Ortega v. Reina case, which involved a vehicle stop, someone who claimed that they did not commit a moving violation, claimed that they were not recalcitrant with the officer and refused to sign the citation. Notwithstanding those issues of fact, the court found discretionary immunity, the decision to make a motor vehicle stop, decision to arrest were discretionary in nature. Those were the cases in which the Ninth Circuit approached the Kerry case, which counsel addressed. And Kerry, I think the most compelling part of it is the Ninth Circuit remanded to the United States District Court of Nevada on the Section 1983 claims, indicating that there's an issue of fact as to whether it was reasonable and whether the plaintiff pierced the qualified immunity on false arrest on an excessive force, but still found the analogous claims of assault and battery and false arrest to be subject to immunity, based on the finding that there was no evidence of bad faith. And it would be our submission to what we put forth in the brief, Your Honors, that there's no indication in this case that the officers were involved in a ministerial function,  particularly this was a time-sensitive issue or emergency, and there's no evidence of bad faith to support the district court's ruling on discretionary immunity for the supplemental jurisdiction claims. That being said, there are no questions on that point. The Fourth Amendment Section 1983 theories have two different aspects in this case, one involving the initial entry. And it's our position, Your Honors, that that was a reasonable response based on exigent circumstances. All the evidence suggests that the officers were informed that the emergency situation, that is, a man suspected of a drug dealer armed with a gun holding at least one person at bay, was in Apartment 110. They acted on that information, knocked on the door, and cleared the apartment. There's no indication they used that exigency to conduct some search for contraband, go through drawers. They simply swept the premises, finding no one else inside and determining that there was no exigency in Apartment 110. Thereafter, they moved upstairs after making contact with dispatch and was able to resolve the situation, finding the 911 caller and undermining what he said was the emergency. But the issue for Fourth Amendment purposes and for qualified immunity is that which the officers knew at the time. And all the evidence is they had a fair probability to believe that there was an emergency in that apartment and took prompt and reasonable action. When they found out there wasn't, there still might have been an emergency in the same building upstairs. That's correct. And when they swept 110, got back with dispatch, the evidence suggests that this isn't it. They were then directed to 113, and officers went upstairs, responded there, ended up taking the caller into custody, actually, based on the facts, and I won't review those. But, yes, they had an ongoing emergency up until the time they swept and resolved the issue upstairs at Apartment 113. The officers that made entry into that apartment without a warrant did so reasonably. Certainly, they had no, even if there was confusion as to the apartment, I don't think that it was inappropriate to the sense that the officers could be deemed incompetent or knowingly violating the law to pierce their immunity to go inside and clear that apartment. The second aspect of the Fourth Amendment claim is the use of force. The facts are that they knocked on the door and Mr. Silva responded. At that time, he was hurriedly moved out of the way, out of the threshold of the door, to clear that entryway so they can quickly make entry. To get him out of harm's way and enable the officers to make prompt response inside the interior of the apartment. Mr. Silva did testify in his deposition, and it was in conflict in large part with his affidavit that was set forth to stave off summary judgment. He said two officers, one on each side, took hold of him and moved him. He's not able to describe any of those officers. He's only able to say that he believes he moved faster than he was able to move independently the way they moved him down outside the doorway. He then said he was placed up against the wall. His deposition testimony is the only portion of his body that struck the wall was his chest, and there's no allegation of any injury to the chest or any forcible strike against the wall. The officers then made entry. The other aspect, I jumped ahead briefly, on the force issue is the use of the handguns. The officers taking out their handguns when they initially approached the apartment because they were informed that there was a person armed inside that might pose a threat both to them and the persons inside the apartment. There's no evidence that after Mr. Silva was moved out of the way of the threshold of the door that guns were placed or were pointed at him. There's no evidence that he was placed there. So the only evidence is what he says, and we have to take that as given. And he says basically he was ordered up against the wall at gunpoint and held at gunpoint, and then he's held there for 15 minutes or so. So we have to take all those facts and credit those, do we not? I believe, Your Honor, that's a fair recitation of what he said in his affidavit. I don't think that's a fair recitation of his sworn testimony in the deposition. Was there any dispute about the amount of time that he was outside? I mean, I know he said it was, you know, cops said 15 to 20 minutes. That's what Mr. Silva guessed, being in a shock situation, not having a watch, is he was out there. Did the officers have any kind of testimony on that at all? The testimony that's been submitted on that point, Your Honor, is the communication log that's submitted in the evidence, and well with the affidavits interpreting that communication log, that there was a code red situation, meaning emergency. I wondered why it took so long to sweep the apartment. Well, the time is indicated in the communication log that the code red was initiated, that is they're making entry into the apartment, and it was lifted, that is the emergency resolved, both at 110 and 113 in seven minutes. That was the objective evidence of the communication log recording, you know, a time stamp of what the officers communicated to the dispatcher. Six minutes thereafter, after the emergency was resolved, even upstairs, the medical was called. Mr. Silva also testified. I'm reading it a little different, but they say they're now inside with a drug dealer. That's at 2320, and at 2335, which is 15 minutes later, is when they say he should go for, he says, shaken senior citizen possibly having a heart attack. So he's 15 minutes. That's really the question. At this point, would you agree he's not a suspect? Well, Your Honor, I would say what you read. Let's start back. Is he a suspect during this time when he's outside, whatever's happening to him? Well, the issue at hand here is the object of reasonableness. Answer my question, and then we'll get to your answer. Very well. Is he a suspect? Because that's different than Robinson where he's a potential arrestee. He's not a suspect, is he? I do not believe so, Your Honor. He's just a person that they found in there, and they need to secure the apartment to make sure there's no African American or some other person in there that might come out, right? That's what all the facts suggest, Your Honor. So now they've got him thrown against a wall, he's not a suspect, and they hold him for 15 minutes before they decide he might need medical attention? Your Honor, when you look there at the 2320, that's before the officer's made entry. At 2322 is when you have what says the code red down there about ten lines further down. That's what's the testimony of the officers, and the affidavits are attached there. They initiated the code red shortly before they went inside apartment 110 and encountered Mr. Silva. What you see there at 2320 is information relayed by the caller to dispatch that she was able to summarize to a certain extent in the computer. So it's 13 minutes, not 15. Thirteen minutes? Well, it's seven minutes. If you look at 2329, about 15 lines longer down there, lift code red, subject possible 421A. And I would submit that that's a reference to potential mental illness and I think describes Mr. Silva's state of mind. Was he back inside the apartment when the call for medical help came? The evidence on that, Your Honor, is that Mr. Silva testified in his deposition taking his gospel truth what he said, that as the officers were coming out of his apartment, he was being brought in. And if the emergency is resolved within seven minutes, that is apartment 113 as well, then the objective testimony is he was brought inside prior to that seven-minute period. And that which we have is his subjective testimony in a case. The call that they thought he might be having a heart attack was while he was back in the apartment and not when he was standing outside in the cold. Correct, Your Honor. That's where his counsel said he was thrown onto the love seat, supposedly. And taking Mr. Silva's testimony is he said he was not surprised by the fact the officers carried him in here because of his state of mind and being in a panicked state. He said that the officers, two of them, took him underneath his thighs and his knees, took him inside the apartment, and he said he used the term, tossed him on his love seat and estimated he fell about 12 inches to 18 inches on the love seat. And I do think that Judge Hicks correctly determined that that contact was not plainly the conduct of a plainly incompetent officer, it was not the conduct of an officer knowingly violating someone's rights, and it was not the conduct of an officer whose qualified immunity should be pierced for taking the individual back inside out of the cold onto a love seat waiting medical attention. What injuries came out of being dropped onto the love seat? Your Honor, in all candor, there is no testimony, colorable, competent testimony, Rule 56 testimony as to any injuries at all. Mr. Silva said at one point in his deposition that he had to have surgery for carpal tunnel syndrome. That was his testimony's deposition. There's been no medical testimony linking that to any incident in this case. In fact, there's been no medical records produced at all. And the only place he said he was treated, subpoenas were delivered and they had no record of him being treated there. So the testimony on the medical side is just Mr. Silva's testimony, which is not competent evidence because it is expert caliber type evidence. It must be reasonably linked to a medical degree of probability, and there's no such evidence here. Having said all that, Your Honor, I would say there is no evidence of any injury at all. So to recap, to understand the timing, after the person is inside, a couple minutes go by and then they call Code Red because they still don't know what's happening. Is that right? And so it takes seven minutes to lift the Code Red, and then he's held just six minutes after that. Is that correct? Your Honor, I think we're involved in a certain amount of guesswork that's what's based on the record. Okay. But my reading of the evidence and the officer's affidavits that accompany this communication log that's a part of the record was that the Code Red is a term that the channel be dedicated for that emergency situation. And so no one other officers get on and say they're going to lunch or what have you. And the Code Red was lifted after they went upstairs to 113 and resolved the situation up there. Then we have six minutes later, a couple officers remain with Mr. Silva because of a shaken situation, apologizing to him, trying to see if he's okay, and they call for medical. And then 12 minutes later, he insists that he doesn't want medical attention. They cancel the paramedic's arrival. Anything else, counsel? Your Honor, if there are no other questions, I'll submit another brief at that point. Thank you. You may respond. Getting back to the state tort claims, the Maturi case, which was a handcuffing case, was a case that the Nevada Supreme Court filed in state court, fostered on investigations. And then Ortega was a situation where a highway patrolman either had the discretion to either cite an individual with a citation or arrest. She refused to sign the citation, so he arrested. All three of those cases do not involve constitutional violations. They very well could have in terms of handcuffing a person with that kind of condition behind that person's back. That could have easily been an excessive force claim under the circumstances. But it wasn't. And what the Nevada Supreme Court did not make that finding. What they said is that the handcuff either in the front or the back was discretionary. That's the point of the law, I think. If it's discretionary, the Nevada Supreme Court has said you've got to lay off in law enforcement circumstances. But the situation does not change in 2000 when Lisenby comes down and talks about constitutional violations, that you cannot have constitutional violations. I would also point out that the Kerry case, since that time the U.S. Supreme Court ruled on Hibble versus Nevada, which was a failure to identify type case that went up through the United States Supreme Court. We had essentially the Kerry case talking about a constitutional violation and the U.S. Supreme Court not mentioning the Ninth Circuit law in Kerry and whether Kerry has actually been reversed. It certainly would have been reversed on another ground. But whether Kerry is still good law remains to be seen. I would suspect that in terms of this issue, Kerry did not deal with, once again, a constitutional violation in the sense that this case before you today deals with because what they found was, once again, that there was a statute that was unconstitutional as being applied. As to the injuries that were sustained by Mr. Silva, the testimony was that he, after this, had suffered extreme emotional distress, that he had gone to a psychiatrist, he was treated by the Veterans Administration. Was there a subpoena that was issued for records, and was it discovered that he had not been treated? No. The subpoena that he's talking about is dealing with whether, in fact, the injury to his arm, which he says was an exacerbation, whether, in fact, that was an exacerbation. Clearly, he had treated with the Veterans Administration for his emotional problems, including the distress. He testified that he had tried to commit suicide on three occasions, that this was something that had completely changed his life. Thank you, Counsel. The case to submit is ordered and submitted. We appreciate your help. We'll take a ten-minute recess before hearing the last case on the calendar.
judges: Meskill, Trott, McKeown